NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

STATE OF ARIZONA, *Appellee,*

*v.*

RALPH EDWARDS JONES, *Appellant.*

No. 1 CA-CR 23-0171

FILED 08-13-2024

---

Appeal from the Superior Court in Mohave County
No. S8015CR202200845
The Honorable Richard D. Lambert, Judge

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joshua C. Smith
*Counsel for Appellee*

Jill L. Evans Attorney at Law, Flagstaff
By Jill L. Evans
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge James B. Morse Jr. delivered the decision of the Court, in which Presiding Judge Angela K. Paton joined.  Judge Michael S. Catlett concurs in part and dissents in part.

---

**M O R S E**, Judge:

¶1        Ralph Edwards Jones appeals his convictions and sentences for possession of narcotic drugs, possession of drug paraphernalia, and two counts each of disorderly conduct involving weapons and misconduct involving weapons.  Jones challenges the sufficiency of evidence supporting the four weapons convictions, and he argues the superior court erred by imposing consecutive sentences for those offenses that occurred on the same date.  We affirm.

**FACTS AND PROCEDURAL BACKGROUND**

¶2        The trial evidence, which we view in the light most favorable to sustaining Jones' convictions, reveals the following.  *State v. Guerra*, 161 Ariz. 289, 293 (1989).

¶3        From April to July 2022, employees at a shopping center in Lake Havasu City occasionally found and collected approximately 20 small taped cylindrical items that were charred at the ends in an infrequently used public parking lot behind a shopping center building and next to an adjacent Walmart ("Parking Lot").  Shopping center employees also noticed that two light poles had burn marks on their concrete bases.  Several times, a shopping center security guard heard a "loud boom explosion" from the Parking Lot while he patrolled outside near the Walmart.  The shopping center's operations manager feared someone "was experimenting with something" that could cause more serious damage and called the Lake Havasu City police to report the items.

¶4        Officers viewed Walmart's surveillance video of the Parking Lot recorded on June 25 and July 17, 2022.  Those videos depicted a white or silver truck approach a light pole at night.  The truck momentarily stops when the driver's door abuts the pole's concrete base before proceeding to park in an adjacent lot within view of the light pole.  Shortly after, a bright flash of fire erupts from the pole's base followed by a puff of smoke.  In the

2

June 25 video, a car parked near the truck pulls out from its parking space and proceeds past the truck towards the light pole when the explosion occurs.[1]  It does not appear that the truck driver attempted to stop or otherwise warn the car's driver of the impending explosion.  Other surveillance video from both dates captured Jones smiling as he entered the Walmart alone after the explosions.

**¶5**          Police eventually identified Jones as a suspect and arrested him on July 22.  In Jones' truck, police found homemade improvised explosive devices ("IEDs"), fuses, lighters, and electrical tape.  The explosive devices were "incomplete," but only because "fuse lines" were not attached.  Jones admitted to setting off the devices "at Walmart."

**¶6**          During a search of a recreational vehicle ("RV") to which Jones had access, police found IEDs in various stages of completion.  Police also found items typically used as lethal "fragmentation" when attached to an explosive device, including metal shavings, "BB pellets," and a bag of marbles.  During the search, a detective with the Lake Havasu City police department's bomb squad spoke with Jones.  Jones admitted to making one of the IEDs.  The search also revealed approximately four pounds of explosive material, including "black powder," an explosive compound commonly used in IEDs.  Jones also admitted to making the compound and using it in the IEDs he made.  *See* A.R.S. § 13-3101(A)(3) (defining explosive

---

[1]      In the following still frame from the June 25 video, the device had just exploded and the flash is visible on the right side of the image.  Jones is in the truck to the upper left of the image and slightly behind the driving vehicle.  His driver door appears to be open.



to include "black powder").  Officers confirmed Jones' admissions when they found "priming compound," black powder precursor chemicals, and shipping labels indicating Jones received packages of the chemicals at another RV in which Jones resided.  On a nightstand in the bedroom of the RV Jones resided in, police located a glass pipe and a partially burned fentanyl pill on a piece of tin foil.  Syringes described as "meth paraphernalia" were found in the nightstand drawer.

¶7            The State charged Jones with six felony weapons counts relating to three separate date ranges and two felony drug counts. Referring to June 25–28, 2022, Count 1 alleged Jones committed misconduct involving weapons by manufacturing, possessing, transporting, selling, or transferring a prohibited weapon, a class 4 felony, and Count 2 alleged Jones committed disorderly conduct while recklessly handling, displaying, or discharging a deadly weapon or dangerous instrument, a class 6 felony.[2] Counts 3 and 4 charged the same offenses as Counts 1 and 2, respectively, alleging a date range of July 9–13, 2022.  Counts 5 and 6, respectively, alleged additional misconduct involving weapons and disorderly conduct charges related to July 17–20, 2022.  Count 7 alleged Jones unlawfully possessed a narcotic drug, a class 4 felony, and Count 8 alleged Jones used or possessed to use drug paraphernalia, a class 6 felony.

¶8            At trial, the detective who searched the RV described his training and experience as an expert in explosives.  He then described how IEDs function and are constructed, and how they can cause "catastrophic" physical injury, if not death.  Specifically, the detective explained how IEDs detonated with a fuse can be especially dangerous.  The detective further testified that homemade devices constructed by unlicensed and untrained individuals, such as Jones, are more dangerous than those professionally manufactured under a license.

¶9            Jones testified at trial.  He did not deny detonating IEDs in the Parking Lot, and he admitted he was the man in the surveillance videos entering Walmart soon after the explosions on June 25 and July 17, 2022. Jones explained that he and four friends were "trying to make fireworks for

_____

[2]     For each date range, the State charged an additional count of misconduct involving weapons based on Jones' alleged status as a prohibited possessor.  Before trial, the court granted the State's motion to dismiss those charges with prejudice, and the court renumbered the indictment accordingly.  We refer to the counts as numbered in the amended indictment.

the 4th of July celebration," and he denied he "[]ever intended to damage, hurt, or injure anyone or anything at anytime." During cross-examination, Jones displayed a "stick of dynamite" tattoo on his left arm.

¶10 The jury acquitted Jones on Counts 3 and 4 but found him guilty of the remaining charges. The State established that Jones had two prior felony convictions, one of which was historical. *See* A.R.S. § 13-105(22) (defining "historical prior felony conviction"). The court considered aggravating and mitigating factors as to each count and found they "balance." Accordingly, based on Jones' status as a category two repetitive offender, the court imposed presumptive consecutive sentences as to all counts except for Count 8, which will be served concurrently with Count 7. Combined, the sentences equal 17 years.

¶11 Jones timely appealed. We have jurisdiction under A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A)(1).

## DISCUSSION

### I. Sufficiency of Evidence.

¶12 Jones does not contest the instructions given to the jury. Nor does he argue that A.R.S. § 13-2904(A) is unconstitutionally vague. Jones' sole argument on appeal is that the evidence was insufficient to sustain the convictions. We review a claim of insufficient evidence de novo. *State v. West*, 226 Ariz. 559, 562, ¶ 15 (2011). Succinctly stated, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at ¶ 16 (quoting *State v. Mathers*, 165 Ariz. 64, 66 (1990)). Sufficient evidence may be direct or circumstantial, and we do "not reweigh the evidence to decide if [we] would reach the same conclusions as the trier of fact." *State v. Borquez*, 232 Ariz. 484, 487, ¶¶ 9, 11 (App. 2013) (quoting *State v. Barger*, 167 Ariz. 563, 568 (App. 1990)). "Reversible error based on insufficiency of the evidence occurs only where there is a complete absence of probative facts to support the conviction." *State v. Soto-Fong*, 187 Ariz. 186, 200 (1996) (quoting *State v. Scott*, 113 Ariz. 423, 424–25 (1976)).

### A. Disorderly Conduct Involving Weapons.

¶13 "A person commits disorderly conduct if, with intent to disturb the peace or quiet of a neighborhood, family or person, or with knowledge of doing so, such person . . . [r]ecklessly handles, displays or

discharges a deadly weapon or dangerous instrument." A.R.S. § 13-2904(A)(6).

¶14 Jones argues the State presented insufficient evidence to support his convictions for disorderly conduct with a weapon. Specifically, Jones contends the State did not prove that the area in which he detonated the IEDs (i.e., the Parking Lot) was a neighborhood and no evidence established that the explosions disturbed any specific person. In its answering brief, the State only argues that sufficient evidence established that Jones disturbed the peace and quiet of a neighborhood and does not respond to Jones' argument about individuals.[3] Jones also argues that the State failed to prove that he had the requisite mental state and that the IEDs were dangerous instruments. The State disputes these arguments.

### 1. Neighborhood.

¶15 During deliberations, the jury sought clarification from the court as to a definition of "neighborhood." Specifically, the jury asked, "[d]oes the definition of neighborhood include a public parking lot?" Out of the jury's presence, the State suggested that the court provide the definition of "neighborhood" from Black's Law Dictionary (11th ed. 2019). Jones' attorney responded that "this is a question that the jury needs to decide for themselves in regard to whether or not that parking lot is a neighborhood . . . I would just prefer to go back and have them consider it in light of all the evidence and all the information they've been given to this point." The court rejected the State's suggestion to provide a definition. The State then asked if the court would tell the jury "that they are allowed to rely on their common sense, personal experience, and logic?" The court

---

[3] On appeal, the State does not argue that Jones disturbed the peace and quiet of a person. Because resolving that issue would require a factual analysis of the trial evidence, rather than a legal analysis of the statutory text, we exercise our discretion to treat that argument as waived by the State. *See State Farm Mut. Auto. Ins. Co. v. Tarantino*, 114 Ariz. 420, 422 (1977) (finding an argument abandoned when it was not addressed in the appellee's brief); *see also State v. Hendrix*, 165 Ariz. 580, 582 (App. 1990) (finding the state waived an argument when it failed to raise it on appeal); *cf. also Willis v. Bernini*, 253 Ariz. 453, 458, ¶ 13 (2022) (exercising discretion to overlook waiver for matters of "great public importance or likely to recur" (quoting *Est. of DeSela v. Prescott Unified Sch. Dist. No. 1*, 226 Ariz. 387, 389, ¶ 8 (2011))); *State v. Brita*, 158 Ariz. 121, 124 (1988) (noting that waiver is more appropriate for "fact-intensive" issues based on "sound principles of judicial policy").

noted that the instructions already directed the jury to rely on "reason, common sense, and experience," and gave a final instruction consistent with Jones' urging: "You must rely on the jury instructions, your notes, and the evidence presented in court to make this factual determination." Both parties assented to the court's proposal.

**¶16** Jones points out that Arizona's statutes do not define "neighborhood," and cites *State v. Villegas-Rojas*, 231 Ariz. 445 (App. 2012), to argue that "neighborhood" connotes a group of people and a "group of people is not a parking lot. A neighborhood is not a remote parking lot." But contrary to Jones' argument, the *Villegas-Rojas* court did not suggest that "neighborhood" means a group of people. Instead, the passage from that case quoted by Jones is only the recitation of the superior-court's ruling. *Id.* at 447, ¶ 7. And the superior court merely recites the general principle that a disorderly conduct charge does not have to specify an individual victim: "For example, in a disorderly conduct situation, where the peace of a neighbor has been disturbed, the entirety of the neighborhood or a group of people at the scene are usually not identified by individual name." *Id.* (quoting superior-court ruling). Thus, *Villegas-Rojas* did not define "neighborhood" as a "group of people."

**¶17** Next Jones argues that our supreme court provided a definition for "neighborhood" in *State v. Johnson*, 112 Ariz. 383 (1975). Both Jones and the dissent argue that *Johnson* defined "neighborhood" consistent with Webster's Third New International Dictionary definition. *See Infra* at ¶ 66–67. This is an inaccurate characterization. The *Johnson* court rejected the defendant's argument that "neighborhood" means a "locality" and that the term is overbroad. The court noted that "neighborhood" was susceptible to other interpretations, consistent with its "common meaning":

> We find no merit to appellant's argument that the term "neighborhood" refers **only** to a locality. Reference to any standard dictionary indicates that a common meaning **also** is:
>
> > "A number of people forming a loosely cohesive community within a larger unit (as a city, town) and living close or fairly close together . . ." *Webster's Third New International Dictionary*.

112 Ariz. at 385 (emphasis added). Thus, the *Johnson* court acknowledged the quoted Webster's definition, but did not indicate that this definition was the exclusive interpretation of "neighborhood."

¶18 Jones further suggests that we may refer to dictionary definitions to determine whether the Parking Lot could be considered a neighborhood. *See State v. Wise*, 137 Ariz. 468, 470 n.3 (1983) (explaining that courts may reference dictionaries to glean the ordinary meaning of words).

¶19 Since before statehood, Arizona's statutes have made it a crime to disturb the peace and quiet of a "neighborhood." *See* Revised Statutes of Arizona Territory 1901, Penal Code Pt. 1, Tit. 11, § 379 (making it a crime to "maliciously and wilfully disturb[] the peace or quiet of any neighborhood, family or person"); Revised Code of Arizona 1928, Pt. 4, Ch. 106, § 4722 (same); Arizona Code 1939, Vol. 3, § 43-1308 (same); A.R.S. § 13-2904(A) (1978) ("A person commits disorderly conduct if, with intent to disturb the peace or quiet of a neighborhood . . . ."). In 1912, the New Websterian Dictionary defined "neighborhood" as an "adjacent district; vicinity; the state of being neighbors." *See Matthews v. Indus. Comm'n*, 254 Ariz. 157, 164, ¶ 36 (2022) (describing the New Websterian Dictionary (1912) as an "authoritative dictionary").

¶20 The legislature last amended A.R.S. § 13-2904 in 1994. At that time, Black's Law Dictionary defined "neighborhood" as follows:

> A place near; an adjoining or surrounding district; a more immediate vicinity; vicinage.
>
> It is not synonymous with territory or district but is a collective noun, with the suggestion of proximity, and refers to the units which make up its whole, as well as to the region which comprehends those units. A district or locality, especially when considered with relation to its inhabitants or their interests. In ordinary and common usage "locality" is synonymous in meaning with "neighborhood," and neither connote large geographical areas with widely diverse interests.

*Neighborhood*, Black's Law Dictionary (6th ed. 1990) (citations omitted);[4] *see State ex rel. Brnovich v. Ariz. Bd. of Regents*, 250 Ariz. 127, 131–32, ¶ 15 (2020)

---

[4] The initial sentence of the Black's Law Dictionary definition remained unchanged from 1910 to 1990. *See Neighborhood*, Black's Law Dictionary (2d ed. 1910). The second and third sentences of the definition were added in 1933. *See Neighborhood*, Black's Law Dictionary (3d ed. 1933).

(citing, with approval, the use of Black's Law Dictionary definitions to interpret statutes); *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 526 (2009) (interpreting a statute based on the understanding of terms at the time of enactment). Another contemporaneous dictionary defined "neighborhood" as a "district or area with distinctive characteristics," or the "people who live in a particular district or area." *Neighborhood*, The American Heritage Dictionary (2d Coll. ed. 1991).

**¶21** None of these definitions suggest that "neighborhood" is exclusively synonymous with a group of people or that a "neighborhood" must include a residential component. While some definitions suggest a "neighborhood" may include "inhabitants or their interests," or "people who live in a particular district or area," it may also be defined by "the units which make up its whole," without regard to people or inhabitants.

**¶22** As discussed above, *supra* ¶ 17, in *Johnson*, our supreme court acknowledged that "neighborhood" is capable of more than one meaning. *See* 112 Ariz. at 384. In another case, our supreme court endorsed the notion that a group of businesses could form a neighborhood, concluding that a "somewhat loud" conversation in "the neighborhood of the Apache Café and the Jones restaurant and pool hall . . . would have no tendency to disturb the peace or quiet of that neighborhood or any family or person." *Platt v. Greenwood*, 50 Ariz. 158, 163 (1937). The *Platt* court further explained that "there is no evidence that there was any family living in that immediate neighborhood, or that the conversation, though loud, was unusual." *Id.* The dissent contends that *Platt* supports the view that a "neighborhood" only refers to people living near one another. *Infra* ¶ 65. However, the *Platt* court used "or" to indicate that either evidence could have sufficed, i.e., the loud conversation disturbed "any family or person" *or* "that neighborhood" of the Apache Café and the Jones restaurant and pool hall. 50 Ariz. at 163. *Platt* does not stand for the dissent's proposition that both were necessary. *Id.* And, contrary to the dissent's assertion that "neighborhood" requires a residential component, *infra* ¶ 54–55, 70, in *In re L.G.*, 2 CA–JV 16–0223, 2017 WL 2290912, at *2, ¶ 8 (Ariz. App. May 25, 2017) (mem. decision), this Court found that a "crowd of people attending" a high school football game constituted a "neighborhood" whose peace and quiet had been disturbed.

---

The final sentence of the definition was added in 1951. *See Neighborhood*, Black's Law Dictionary (4th ed. 1951).

¶23 In other contexts, our courts have acknowledged that neighborhoods can be "residential," "business," "retail," or "commercial." *See State v. Hausner*, 230 Ariz. 60, 68, ¶ 5 (2012) (referencing "business and residential neighborhoods"); *City of Scottsdale v. Superior Court*, 103 Ariz. 204, 205 (1968) (discussing "neighborhood commercial" zoning designations); *Decker v. Hendricks*, 97 Ariz. 36, 38 (1964) (discussing "neighborhood retail" property use restrictions). And our courts have used "residential neighborhood" to specify neighborhoods in which people reside. *See State v. Rojo-Valenzuela*, 237 Ariz. 448, 449, ¶ 2 (2015) ("After a high-speed pursuit through a residential neighborhood . . . ."); *State v. Gill*, 234 Ariz. 186, 188, ¶ 6 (App. 2014) ("The accident happened at approximately 1:30 a.m. in a residential neighborhood . . . ."); *Walker v. City of Scottsdale*, 163 Ariz. 206, 208 (App. 1989) ("The narrow question presented is whether . . . a maintained bike path running through a greenbelt area of an urban, residential neighborhood in a suit . . . .").

¶24 Finally, other state courts have interpreted "neighborhood" in their disorderly conduct statutes to encompass both residential and commercial components. *See Morris v. Indiana*, 88 N.E.2d 328, 329 (Ind. 1949) (holding that a neighborhood "as used in the disorderly conduct statute, includes both residential and business sections" to include "any other businesses to which the public is invited . . . whether within or outside a business establishment"); *City of Charleston v. Coker*, 184 S.W. 1181, 1181 (Mo. Ct. App. 1916) (noting that "neighborhood" should not be "confine[d] [to] the application of . . . a residence district"); *Ohio v. Dorso*, 446 N.E.2d 449, 451 (Ohio 1983) (using dictionary definitions to define "neighborhood" as "the quality or state of being immediately adjacent or relatively near to something" and "a place or region near" and "the people living near one another").

¶25 Here, Jones opposed any further instruction regarding the meaning of "neighborhood" and urged the jury to rely on the instructions given. This was the correct approach. *See State v. Barnett*, 142 Ariz. 592, 594 (1984) (holding that the court need not define a word if it is one "commonly understood by those familiar with the English language"). In such situations, we rely on the jury to apply their common sense and experience to interpret common words and phrases in a jury instruction:

> When a word in a statute is undefined, courts apply the ordinary meaning of the term. This holds true when the term is part of a jury instruction based on a statute, and jurors are usually instructed to apply the ordinary meaning of any word or phrase not defined by the court.

*State v. Dann*, 220 Ariz. 351, 368, ¶ 88 (2009) (citation omitted).

**¶26**        When a defendant is charged with disorderly conduct for disturbing the peace of a neighborhood, the "defendant's conduct may be measured against an objective standard, and the state need not prove that any particular person was disturbed." *State v. Burdick*, 211 Ariz. 583, 585, ¶ 8 (App. 2005).  The jury heard evidence that the Parking Lot was open to the public, adjacent to a Walmart and shopping center, and that kids sometimes skateboarded in the Parking Lot.  The jury saw photos and video footage of the explosions and their proximity to the shopping area as well as the cars parked around the Parking Lot, including one car driving near an exploding IED.  The jury also saw video evidence of Jones entering the adjacent Walmart after the June 25 explosion, demonstrating his knowledge that the store was open.  Viewing the evidence "in the light most favorable to the prosecution," a "rational trier of fact" applying its collective common sense and experience, could conclude that the units of the shopping center, Walmart, and the appurtenant parking lots, constituted a commercial, retail, or business "neighborhood" for purposes of the charged offenses.  *See West*, 226 Ariz. at 562, ¶ 16; *see also State v. Mixton*, 250 Ariz. 282, 291, ¶ 33 (2021) (noting courts may consider a statute's "spirit and purpose" when discerning the meaning of a term that the statute itself does not define (quoting *Wyatt v. Wehmueller*, 167 Ariz. 281, 284 (1991))).

### 2.        Dangerous Instruments.

**¶27**        Jones argues that there was insufficient evidence to prove that the IEDs were dangerous instruments.  Specifically, Jones contends that the devices were not "readily capable of causing death or serious physical injury" under the circumstances they were used.  The State argues that the IEDs should be considered a dangerous instrument because they are "capable of causing . . . serious physical injury."  We agree with the State that the jury heard evidence from which it could reasonably determine that the IEDs were capable of causing death or serious injury.

**¶28**        "Dangerous instrument" means "anything that under the circumstances in which it is used, attempted to be used or threatened to be used is readily capable of causing death or serious physical injury."  A.R.S. § 13-105(12).

**¶29**        At trial, the jury heard testimony from a trained bomb squad detective who searched the RV and spoke with Jones.  He explained that the "explosion itself [resulting from a] rapid expansion of gases" during an IED explosion can itself (i.e., without the addition of shrapnel) be lethal.

Further, while Jones contends that the devices were "tested" in an "empty remote parking lot late at night for safety reasons," the video footage from June 25 shows the lot was not empty as a vehicle drove by as the IEDs exploded.

**¶30** Relying on the detective's testimony, and upon viewing the video footage of the explosions in the Parking Lot, a reasonable jury could apply its collective common sense and experience to conclude that the IEDs were "readily capable of causing death or serious physical injury." *See State v. Fischer*, 242 Ariz. 44, 49, ¶ 15 (2017) (noting that we defer to the jury's factual findings "and generally will not set aside the verdict unless no evidence supports it").

### 3. Jones' Culpable Mental States.

**¶31** Jones contends that there was "insufficient evidence of the required mental states of recklessly and with the intent to disturb" to convict him of disorderly conduct. Specifically, Jones contends that "there is no evidence that he knew or should have known that anyone would be disturbed." The State argues that Jones knowingly disturbed the peace and recklessly discharged a dangerous instrument.

**¶32** The mental states required for an individual to commit disorderly conduct are (1) with intent or knowledge to disturb the peace or quiet and (2) recklessly handling, displaying, or discharging a deadly weapon or dangerous instrument. A.R.S. § 13-2904(A)(6). Jones' argument that the evidence failed to show he intentionally or knowingly disturbed a neighborhood while recklessly handling IEDs on June 25 and July 17 is unpersuasive.

**¶33** "'Intentionally' or 'with the intent to' means, with respect to a result or to conduct described by a statute defining an offense, that a person's objective is to cause that result or to engage in that conduct." A.R.S. § 13-105(10)(a). "'Knowingly' means, with respect to conduct or to a circumstance described by a statute defining an offense, that a person is aware or believes that the person's conduct is of that nature or that the circumstance exists. It does not require any knowledge of the unlawfulness of the act or omission." A.R.S. § 13-105(10)(b). "Recklessly" means "that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard of such risk constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." A.R.S. § 13-105(10)(c).

¶34        The State presented evidence that Jones intentionally drove to a public place, rather than an isolated location, to detonate his IEDs, and he did so at least once approximately two weeks after the Fourth of July. Thus, the jury could readily disbelieve Jones' explanation for his conduct, i.e., that he was making fireworks for the Fourth of July. *See State v. Fimbres*, 222 Ariz. 293, 300, ¶ 21 (App. 2009) (deferring to the jury's assessment of a defendant's credibility and the weight to be given to his testimony when the defendant testified he did not act with an intent to defraud). And in rejecting Jones' explanation, the jury "could consider his false denials as evidence of guilt." *State v. Crain*, 250 Ariz. 387, 400, ¶ 53 (App. 2021).

¶35        The jury also heard evidence of Jones' tattoo; the surveillance video in which Jones appeared joyful with himself right after the explosions on June 25 and July 17; and video of a driver passing near an exploding IED. Moreover, the security guard's testimony showed that Jones' IEDs created "loud booming" explosions, demonstrating the disturbing effect of Jones' conduct. Finally, during the search of the RV, Jones freely explained to police how he constructed an IED and made the black powder located in the RV. Viewed in the light most favorable to the prosecution, a rational jury could infer from the evidence that Jones knew that the Walmart was open and occupied and his public displays of making and detonating IEDs in that store's parking lot satisfied the required mental state. *See State v. Bearup*, 221 Ariz. 163, 167, ¶ 16 (2009) ("Criminal intent, being a state of mind, is shown by circumstantial evidence. Defendant's conduct and comments are evidence of his state of mind." (quoting *State v. Routhier*, 137 Ariz. 90, 99 (1983))).

¶36        Regarding Jones' mental state when he "handled" the IEDs before they detonated, the jury could reasonably conclude that his admission to "setting off" numerous explosives, and the June 25 and July 17 videos, showed intentional, not merely reckless, conduct. *See* A.R.S. § 13-202(C) ("If acting recklessly suffices to establish an element [of a criminal offense], that element also is established if a person acts intentionally or knowingly."). Moreover, Jones' apparent use of time fuses to detonate the explosions in both videos in conjunction with his failure to warn the driver in the June 25 video, demonstrated his conscious disregard for others' peaceful use of the Parking Lot and its surrounding areas. The jury could reasonably find that specific conduct was at least reckless. *See* A.R.S. § 13-105(6) ("'Conduct' means an act or omission and its accompanying culpable mental state.").

### 4.    Individuals Disturbed by Jones' Conduct.

¶37    The State does not argue nor do we need to discuss Jones' assertion that the State failed to prove that any individuals were disturbed by Jones' conduct because there was sufficient evidence to support Jones' conviction of disturbing a neighborhood.

### B.    Misconduct Involving Weapons.

¶38    Jones contends there was insufficient evidence that the IEDs were "designed to destroy anything."  "A person commits misconduct involving weapons by knowingly . . . [m]anufacturing, possessing, transporting, selling or transferring a prohibited weapon . . . ."  A.R.S. § 13-3102(A)(3).  An IED is a "prohibited weapon" pursuant to A.R.S. § 13-3101(8), and is defined as "a device that incorporates explosives or destructive, lethal, noxious, pyrotechnic or incendiary chemicals and that is designed to destroy, disfigure, terrify or harass."  A.R.S. § 13-3101(5). Section 13-3102(A)(3) does not define harass, but another statute, A.R.S. § 13-2921(E), criminalizes harassment, and defines "harass" as conduct "that would cause a reasonable person to be seriously alarmed, annoyed, humiliated or mentally distressed." *See also Terrify*, The American Heritage Dictionary (2d Coll. ed. 1991) ("1. To fill with terror; alarm.  2. To menace or threaten; intimidate.").

¶39    Jones' argument that there was insufficient evidence that the IEDs were designed to destroy anything is misguided because a jury could have reasonably concluded that the IEDs were designed to terrify or harass. Viewed in the light most favorable to sustaining the verdict, the evidence of the large flame and explosion presented in the June 25 and July 17 videos, and the testimony of the security guard who was startled by the blast are sufficient to allow a reasonable jury to conclude that the IEDs could "terrify" or "harass."

¶40    Substantial evidence, therefore, established that Jones intentionally possessed prohibited weapons and transported them to the Parking Lot within the time frames alleged in Counts 1 and 5. *See Borquez*, 232 Ariz. at 487, ¶¶ 9, 11 (noting sufficient evidence may be direct or circumstantial and "is such proof that 'reasonable persons could accept as adequate'" to "support a conclusion of defendant's guilt beyond a reasonable doubt" (quoting *Mathers*, 165 Ariz. at 67)).

## II.    Consecutive Sentences.

¶41    Jones challenges the court's sentencing order, arguing the consecutive sentences imposed for the disorderly conduct and weapons misconduct convictions that occurred on the same dates were not authorized by A.R.S. § 13-116, which according to Jones, required concurrent sentences.  Jones urges us to review for fundamental error, presumably because he did not argue at sentencing that A.R.S. § 13-116 barred consecutive sentences.  But Jones argued in his sentencing memorandum that the court "consider each conviction as part of a continuing string of activity and impose concurrent sentences."  Jones also requested concurrent sentences at the sentencing hearing.  Although not squarely raised below, we will review *de novo* whether the superior court erred in imposing consecutive sentences.  *State v. Urquidez*, 213 Ariz. 50, 52, ¶ 6 (App. 2006).

¶42    To support his argument, Jones claims the disorderly conduct and weapons misconduct convictions on each date "stemmed from the same act and involved the same weapons."  Although we agree that the offenses involved the same IED on each date, we disagree that the disorderly conduct and weapons misconduct offenses involved the same act.  Jones completed the weapons misconduct offense by possessing the IED.  He completed the disorderly conduct offense by detonating the IED. *See* A.R.S. § 13-116 ("*An act* or omission which is made punishable in different ways by different sections of the laws may be punished under both, but in no event may sentences be other than concurrent.") (emphasis added).  Because Jones could have committed weapons misconduct without committing disorderly conduct, and he increased the risk of harm by detonating the IEDs in his possession, the imposition of consecutive sentences did not violate A.R.S. § 13-116. *See State v. Gordon*, 161 Ariz. 308, 315 (1989) (setting forth analysis for courts to determine whether crimes are one act that require concurrent sentences under § 13-116); *State v. Cotten*, 228 Ariz. 105, 109–10, ¶¶ 13–14 (App. 2011) (applying *Gordon* and affirming consecutive sentences for theft of a firearm and weapons misconduct for possessing that same firearm).

## CONCLUSION

¶43    Jones' convictions and sentences are affirmed.

C A T L E T T, Judge, dissenting in part:

¶44        I join that portion of the majority opinion affirming the defendant's two convictions for misconduct involving weapons. But, unlike the majority, I would vacate the defendant's two convictions for disorderly conduct involving weapons (thereby making the consecutive sentencing issue moot).

¶45        The disorderly conduct convictions require us to decide whether an isolated parking lot is a "neighborhood." While a parking lot can be in a neighborhood, a parking lot can't be its own neighborhood. Because the State argues only that "the parking lot should be considered a 'neighborhood' for the purposes of § 13-2904," and the evidence at trial did not otherwise establish intent to disturb a "neighborhood," I would vacate the two convictions for disorderly conduct based on insufficient evidence.

## I.

¶46        After retiring, Ralph Edward Jones ("Jones") took up homemade explosive devices as a hobby. On at least two Saturday nights in June and July of 2022, Jones ignited some of those devices in an isolated parking lot behind a Walmart in Lake Havasu City.

¶47        The trial testimony revealed little about the area surrounding the parking lot. All the jury heard was that the parking lot is behind a Walmart and between a Star Cinema, and the lot is in an isolated area. The jury also heard vague references to three other businesses (Maurice's, Dillard's, and Milemarkers) being somewhere nearby. The State didn't otherwise elicit testimony about the shopping center or the surrounding area. Given that dearth of evidence, the jury was understandably confused about whether the area where Jones ignited his devices constitutes a "neighborhood," so they asked the superior court for guidance. The superior court understandably elected not to weigh in.

¶48        The jury convicted Jones of two counts of disorderly conduct involving weapons. After running the sentences for those two counts consecutive to the sentences for two counts of misconduct involving weapons, the superior court sentenced Jones to 17 years in prison.

## II.

¶49        On appeal, Jones challenges the disorderly conduct convictions for insufficient evidence. He argues that "the remote rarely used parking lot behind a shopping center was not a 'neighborhood.'" In response, "[t]he State acknowledges that a parking lot may not constitute a

neighborhood in every case." But here, the State argues, there were people and cars at the nearby Walmart, "so the parking lot should be considered a 'neighborhood' for the purposes of § 13-2904." To be clear, the State doesn't argue that the Walmart and the parking lot in front of it was a neighborhood. Instead, the State argues only that the presence of people and cars at the Walmart somehow transformed the isolated parking lot behind the Walmart into its own neighborhood. That argument is inconsistent with the common meaning of the word "neighborhood," the structure of the disorderly conduct statute and other statutes creating offenses against the public order, the purpose of the disorderly conduct statute, and prior case law.

**A.**

¶50        My starting point is the common meaning of the word "neighborhood" in the disorderly conduct statute, A.R.S. § 13-2904. That statute provides that "[a] person commits disorderly conduct if, with intent to disturb the peace or quiet of a neighborhood, family or person, or with knowledge of doing so, such person" commits any one of six enumerated acts. A.R.S. § 13-2904(A). The statute has existed since the dawn of statehood in 1913 and has always used the phrase "neighborhood, family or person." *See id.*; 1977 Ariz. Sess. Laws ch. 142 (H.B. 2054); Ariz. Rev. Stat. Penal Code § 4722 (1928); Ariz. Rev. Stat. Penal Code § 423 (1913). When interpreting statutory language, we should give terms "the original public meaning understood by those who used and approved them." *Matthews v. Indus. Comm'n. of Ariz.*, 254 Ariz. 157, 163 ¶ 29 (2022). Though the legislature amended the disorderly conduct statute a few times during the past century, it didn't re-write the term "neighborhood." Nor is there any indication the legislature otherwise altered the substance or meaning of the phrase "neighborhood, family or person." *See id.* at 165 ¶ 40 ("When a subsequent enactment imports unchanged earlier language, it imports the original meaning as well."). Because we are duty-bound to interpret statutory terms to "mean what they conveyed to reasonable people at the time they were written," we should apply the common meaning of "neighborhood" at the time of that term's adoption in 1913. Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 16 (2012); *see also* A.R.S. § 1-213.

¶51        "Our examination of original public meaning starts with dictionary definitions from the time the provision was adopted." *Matthews*, 254 Ariz. at 163 ¶ 33. As the majority explains, the New Websterian Dictionary from 1912 defines "neighborhood" as "an adjacent district; vicinity; the state of being neighbors." But that truncated definition doesn't tell the whole story. Other dictionaries around that time provide more

context. For example, Webster's Dictionary in 1913 defined "neighborhood" as "[a] place near; vicinity; adjoining district; a region the inhabitants of which may be counted as neighbors" or "the inhabitants who live in the vicinity of each other." *Neighborhood*, Webster's Dictionary (1913), https://www.websters1913.com (last visited June 26, 2024). Webster's New International Dictionary in 1923 said a "neighborhood" is (1) "[a] place near; vicinity; region near," (2) "[t]he people living near one, or near one another," or (3) [a] district or section, esp. with reference to the character of its inhabitants." *Neighborhood*, Webster's New International Dictionary (1923). The Oxford English Dictionary, which published the volume containing words beginning with N in 1933, defined "neighborhood" as (1) "[t]he vicinity, or near situation, *of* something," (2) "[a] community; a certain number of people who live close together," or (3) "the people living near to a certain place or within a certain range." *Neighborhood*, 7 Oxford English Dictionary (1933). Finally, to the extent one can glean common meaning from a dictionary aimed at the legal profession—I'm doubtful—Black's Law Dictionary from 1910 explains that a "neighborhood" is "[a] place near; an adjoining or surrounding district; a more immediate vicinity; vicinage." *Neighborhood*, Black's Law Dictionary (2d ed. 1910).

**¶52**        Under none of those definitions is an isolated parking lot a "neighborhood." For starters, it's very unlikely that § 13-2904 uses the term "neighborhood" to mean "vicinity." The statute refers to "*a* neighborhood," which strongly indicates that it uses "neighborhood" as a noun, and not to refer to one thing being in the vicinity of another thing. One might say, for example, "I was in *the neighborhood* of the Walmart parking lot" to describe being in the vicinity of the Walmart parking lot. But one would not say, "I was in *a neighborhood* of the Walmart parking lot" to describe being close to that parking lot. Vicinity isn't a viable definition.

**¶53**        How about defining neighborhood as an "adjacent district"? An adjacent district is a noun, so that checks out. But using neighborhood in the disorderly conduct statute to mean adjacent district is awkward. Just substitute "adjacent district" for neighborhood in the statute to see what I mean. The statute would then read, an "adjacent district, family, or person." Which one of the terms in that phrase isn't like the others? If you said, "adjacent district," I agree. That poor fit is problematic because a word in a statute should be interpreted in context with the company it keeps (that principle is known as the *noscitur a sociis* canon). *Est. of Braden ex rel. Gabaldon v. State*, 228 Ariz. 323, 326 ¶ 13 (2011); *Diaz v. United States*, 602 U.S. ___, 2024 WL 3056012, at *6 (2024) ("But, a word's meaning is informed by its surrounding context. A crucial part of that context is the other words in

18

the sentence." (internal citation omitted)); *see also In re Drummond*, ___ Ariz. ___, 543 P.3d 1022, 1026 ¶ 9 (2024) ("[C]onsidering the term 'mobile home' in the context of § 33-1101(A)'s other subsections dispels any purported ambiguity regarding the term's meaning."). When the words "person or family" refer to human beings, it would be odd for "neighborhood" to refer to an adjacent "territorial division," which is how "district" is defined in the 1912 dictionary the majority uses. *District*, New Websterian Dictionary (1912).

¶**54** The final option is to define "neighborhood" as a group of people living near one another. That definition makes "neighborhood" a noun—a promising start. It also fits well with the term's statutory neighbors. Let's see how the statute sounds when we replace neighborhood with this last definition. The statute would then read, a "group of people living near one another, family or person." That works much better than either of the first two definitional options. And using that definition makes all three terms consistent in that each then refers to a person or a group of people.

¶**55** Determining the original public meaning of a term can also "be aided by corpus linguistics, which employs a massive database that enables date-specific searches for the possible, common, and most common uses of words or phrases as they were used in newspapers, books, magazines, and other popular publications." *Matthews*, 254 Ariz. at 163 ¶ 33. A corpus linguistics review of the term "neighborhood" between 1910 and 1920 reveals that the term was most often used to mean vicinity or to describe a group of people living near one another. Search of "Neighborhood" from 1910-1920, Corpus of Hist. Am. Eng., https://www.english-corpora.org/coha/ (last visited June 27, 2024) (populating 726 source references). For reasons already discussed, defining the term "neighborhood" in § 13-2904(A) as "vicinity" is not a viable option. So, based of corpus linguistics, "a group of people living near one another" is the best original meaning of "neighborhood" as that term is used in § 13-2904. Most importantly, I couldn't locate a single instance where "neighborhood" was used to refer to an isolated parking lot (even with people or businesses nearby). *Id.*

¶**56** Thus, one commits disorderly conduct if he commits any one of the six enumerated acts in § 13-2904 with the intent to disturb a group of people living near one another, a family, or a person. Because the State showed only that Jones ignited his devices in an isolated parking lot, which is insufficient to show Jones acted with an intent to disturb a group of people living near one another (*i.e.*, a neighborhood), I would vacate Jones's two disorderly conduct convictions.

**B.**

¶57        Other clues support that conclusion and undercut the State's position.  To start, the statute criminalizing disorderly conduct is now contained in title 13, chapter 29, which criminalizes offenses against public order.  Chapter 29 defines and uses the term "public."  *See* A.R.S. § 13-2901(2).  That term is defined as "affecting or likely to affect a substantial group of persons."  *Id.*  Chapter 29 then uses the term "public" when criminalizing certain actions that "disturb[] the public peace."  *See* A.R.S. §§ 13-2903 (criminalizing rioting), 13-2905(A)(1) (criminalizing loitering).  Had the Legislature wanted to protect the peace or quiet of places where people congregate for commercial, retail, or business purposes, it could have used "public" instead of "neighborhood" in the disorderly conduct statute.  It could have, for example, said that one commits disorderly conduct when taking certain actions "with intent to disturb the public peace," meaning the peace of a substantial group of persons (for example, people shopping at a Walmart).  Or the Legislature could have said one commits disorderly conduct when taking certain actions "with intent to disturb the peace or quiet of a neighborhood, family, person, or the public."  If the Legislature had made either of those changes (or others that could have broadened the statute), the State's position and the majority's analysis would likely be correct.  But the Legislature hasn't seen fit to expand the statute's coverage to the public at large; instead, for the last century, it has been content to leave the disorderly conduct statute's reference to three subclasses of the public—a neighborhood, family, or person.  My definition pays heed to that choice, while the State and majority's position doesn't.

¶58        Next, § 13-2904 isn't the only instance where chapter 29 uses the term "neighborhood."  In A.R.S. § 13-2917, the Legislature made public nuisance a crime.  That statute, since 1913, has also used the term "neighborhood."  *See* A.R.S. § 13-2917(A)(1); Ariz. Rev. Stat. Penal Code § 383 (1913).  The statute currently provides, as it largely did in 1913, that "[i]t is a public nuisance . . . for anything . . . [t]o be injurious to health, indecent, offensive to the senses or an obstruction to the free use of property that interferes with the comfortable enjoyment of life or property by an entire community or *neighborhood* or by a considerable number of persons."  A.R.S. § 13-2917(A)(1) (emphasis added).

¶59        The public nuisance statute's use of "neighborhood" further supports that the term means a group of people living near one another.  Because the Legislature used "neighborhood" in both the disorderly conduct and public nuisance statutes, and both offenses were enacted at the same time (1913) and in the same title (title XI of the penal code), we should give both terms in both statutes the same meaning.  *See Fann v. State*, 251

Ariz. 425, 442 ¶ 60 (2021) ("[W]e presume a word or phrase bears the same meaning throughout a text."). The meaning I ascribe to "neighborhood" is the only one that makes sense in both statutes. Defining "neighborhood" as "vicinity" in the public nuisance statute makes no sense (again, replace "neighborhood" with "vicinity" to see what I mean). And "adjacent district" fares little better—an adjacent district (*i.e.*, an adjacent "territorial division") cannot comfortably enjoy life or property. But "a group of people living near one another" makes perfect sense. Again, such a group is similar in nature to "an entire community" and "a considerable number of persons," the neighboring phrases in § 13-2917. And a group of people living near one another can comfortably enjoy life or property, such that interference with such enjoyment constitutes a public nuisance. Moreover, § 13-2917 is another example where the Legislature used a more expansive phrase than neighborhood—"a considerable number of persons"—when it wanted to criminalize actions that affect the public more broadly (by, for example, igniting incendiary devices in an isolated parking lot nearby a large retail store where customers are shopping).

¶60 The State's treatment of "neighborhood" could greatly expand criminal liability for public nuisance. Under the State's view, for example, it could bring a public nuisance charge against someone for blocking access to an isolated parking lot, thereby interfering with the comfortable enjoyment of property by the owner of the isolated parking lot (*i.e.*, the owner of a neighborhood), so long as the lot is close enough to other property where people sometimes congregate. Allowing the State to bring a *public* nuisance prosecution based on the theory that a parking lot is a "neighborhood" unto itself would be, to put it mildly, a novelty. "The law of nuisance is aptly described as an impenetrable jungle that has been applied indiscriminately as a substitute for any analysis of a problem." *Hopi Tribe v. Ariz. Snowbowl Resort Ltd. P'ship*, 245 Ariz. 397, 404 ¶ 24 (2018) (internal punctuation omitted). The State's interpretation of "neighborhood" risks making that issue worse and further proves that its interpretation is mistaken.

¶61 History also doesn't support the State. Despite the statutory language at issue existing for more than a century, the State cannot muster even one example where it was applied in a factual situation like that here. If the State's interpretation is correct, finding supporting examples of convictions shouldn't be too hard. It's not as if the disorderly conduct statute is rarely used. To the contrary, it's often used when no other criminal statute quite fits. The majority musters one Arizona decision where a juvenile was adjudicated delinquent under the disorderly conduct statute for disturbing the peace or quiet of a crowd at a high school football

game. *See In re L.G.*, No. 2 CA-JV 16-0223, 2017 WL 2290912, at *2 ¶ 8 (Ariz. App. May 25, 2017) (mem. decision). But there is no indication in that unpublished decision that the juvenile challenged the "neighborhood" element and there is no legal analysis supporting the court's conclusion that a crowd at a high school football game is a "neighborhood." Regardless, one unpublished Arizona decision is a thin reed. The absence of any other Arizona examples is telling.

¶62 Lastly, the State's position is unmoored from the purpose for criminalizing disorderly conduct. "The whole purpose of the statute proscribing disturbing the peace is to preserve the equanimity of people." *State v. Cisneroz*, 190 Ariz. 315, 317 (App. 1997). The State admits there were no people in the neighborhood it relies upon (the isolated parking lot) to support Jones's disorderly conduct convictions. To be sure, the State claims there were people at Walmart when Jones ignited his devices. But, again, the State does not claim that the Walmart (or any other surrounding area) constitutes a neighborhood that Jones intended to disturb. Instead, the State argues only that "the parking lot should be considered a 'neighborhood' for the purposes of § 13-2904." The State admits, however, that not all parking lots are neighborhoods. The State's theory is that an empty parking lot *with* people nearby is a neighborhood unto itself, but an empty parking lot *without* people nearby is not. But, in both situations, the parking lot is empty. It is difficult to see how convicting one of disorderly conduct for intending to disturb the peace or quiet of an empty parking lot could ever further the purpose of preserving the equanimity of people.

## C.

¶63 Unlike the Majority's analysis and the State's argument, defining "neighborhood" as a group of people living near one another is also consistent with prior case law. Start with *Platt v. Greenwood*, 50 Ariz. 158 (1937). In that case, Platt brought a claim against Greenwood, the Apache County Sheriff, for unlawful arrest and false imprisonment. *Id.* at 159. Greenwood claimed he arrested Platt after Platt interfered with Greenwood's attempt to arrest a third individual, Nordyke. *Id.* at 160. Our supreme court therefore analyzed whether Greenwood was exercising an official duty while arresting Nordyke. *Id.* at 162. The only possible offense for which Nordyke could have been arrested was disturbing the peace. *Id.* At the time, that offense occurred when "a person maliciously and willfully disturbs the peace or quiet of any neighborhood, family, or person by loud or unusual noise[.]" *Id.* at 162–63.

¶64 The court concluded there was insufficient evidence that Nordyke was disturbing the peace. As the majority recites, the court

explained that the conversation Greenwood heard "in the neighborhood of the Apache Café and the Jones restaurant and pool hall, though it may have been somewhat loud, would have no tendency to disturb the peace or quiet of that neighborhood or any family or person." *Id.* at 163. But the majority downplays our supreme court's explanation for coming to that conclusion. *See* Maj. Dec. ¶ 22. The court explained that "there is *no evidence that there was any family living in that immediate neighborhood*, or that the conversation, though loud, was unusual." *Platt*, 50 Ariz. at 163 (emphasis added). In other words, although "Nordyke was talking loudly so that passers-by could hear him," he was not disturbing the peace of a neighborhood because no one lived nearby. *Id.*

¶65 Thus, *Platt* doesn't support the majority's conclusion that Jones could be found guilty of disorderly conduct simply because "the area around the Parking Lot was a commercial, retail, or business 'neighborhood' for purposes of the charged offenses." Maj. Dec. ¶ 26. Instead, *Platt* supports my view that "neighborhood" in § 13-2904 refers to a group of people living near one another. Our supreme court rejected that Nordyke had disturbed the peace or quiet of the neighborhood because, although there were "passers-by" in the area, there was no evidence that anyone was living nearby the cafe and pool hall. The same is true here. There is no evidence that, though there were "passers-by" in the area, anyone was living nearby the isolated parking lot at the heart of the State's prosecution (or even nearby the Walmart), and thus there is no evidence from which a jury could have concluded beyond a reasonable doubt that Jones intended to disturb the peace or quiet of a neighborhood.

¶66 Next is *State v. Johnson*, 112 Ariz. 383 (1975). Johnson was convicted of disturbing the peace after officers heard her screaming "from a house, two houses distant from their location" (so there was no question she was in a neighborhood). *Id.* at 384. Johnson challenged the disorderly conduct statute on grounds that the term "neighborhood" is unconstitutionally vague because it refers only to a "locality." *Id.* Our supreme court rejected that challenge by adopting a narrower definition of "neighborhood." *Id.* at 385. The court defined "neighborhood" like this: "A number of people forming a loosely cohesive community within a larger unit (as a city, town) and living close or fairly close together." *Id.* (citing Webster's Third New International Dictionary).

¶67 That definition is consistent with the definition I would employ, and inconsistent with the State and majority's position. Under *Johnson*'s definition, neither an isolated parking lot standing alone nor a parking lot near a retail business is a "neighborhood." The majority attempts to explain away *Johnson* by positing that the court adopted a

second definition for "neighborhood," in addition to "vicinity." The majority's take is that *Johnson* avoided vagueness by blessing two definitions and further expanding the meaning of a statutory term. That misunderstands the court's analysis. Expanding the meaning of a statutory term is an unorthodox way to reject a vagueness challenge. But that isn't what the court did. Correctly understood, *Johnson* refused to define "neighborhood" broadly as "vicinity," instead adopting a narrower definition, and then rejected the vagueness challenge. That reading of the opinion makes much better sense—courts often narrow statutory terms in response to vagueness challenges. *See Webb v. State ex rel. Ariz. Bd. of Med. Exam'rs*, 202 Ariz. 555, 561 ¶ 26 (App. 2002) ("Before a court concludes that a statute is unconstitutionally vague, the court should consider whether a narrowing construction would clarify the meaning of the statute[.]"). *Johnson* is one example of that practice. We should heed our supreme court's decision in *Johnson* and narrowly define "neighborhood"; the majority, instead, re-injects the vagueness the court tried to eliminate.

## III.

**¶68**        The issue we now grapple with was of the State's own creation. At trial, the State called multiple employees of the shopping center adjacent to the isolated parking lot as witnesses. But the State didn't ask any of them to describe the surrounding area in detail. We are therefore left with a threadbare record about that area, and the State is left arguing that an isolated parking lot is a neighborhood.

**¶69**        Yet the majority bails the State out by concluding that the jury could have found that the area nearby the isolated parking lot was a neighborhood—a theory the State does not press. It's not clear, however, what definition of "neighborhood" the majority employs in so doing. The most likely candidate is "adjacent district." For the reasons explained above, that is not a viable option for the common meaning of "neighborhood" in § 13-2904. Tellingly, *Johnson* did not even discuss that definition as a potential option. Even if adjacent district is a viable option, it is not clear how a Walmart attached to an isolated parking lot is an adjacent district. Again, "district" is defined as a "territorial division." *See infra* ¶ 53. How is a Walmart next to and accessible from an isolated parking lot an adjacent territorial division? The majority does not explain.

## IV.

**¶70**        The common meaning of the term "neighborhood" in § 13-2904(A) is a group of people living near one another. Having the intent to disturb the peace or quiet of such a group is an essential element of the

crime with which Jones was twice convicted. The State therefore was required to adduce evidence proving beyond a reasonable doubt that Jones acted with such intent. Because the State failed to do so, I would vacate Jones's two disorderly conduct convictions. The majority instead affirms those convictions. With respect, I dissent.



AMY M. WOOD • Clerk of the Court
FILED: AGFV